UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LAKESIDE ROOFING COMPANY, et al., | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:10CV1761 JCH |
| | ) | |
| JEREMIAH W. NIXON, et al., | ) | |
| | ) | |
| Defendant(s). | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiffs' Motion for Summary Judgment (ECF No. 70),

and Defendants' Motion for Summary Judgment (ECF No. 72), both filed on October 31, 2011.

Plaintiffs and Defendants both filed responses in opposition, and while Plaintiffs also filed a reply to

Defendants' response, Defendants failed to reply to Plaintiffs' response.  Since the time for filing a

reply has passed, the Court will rule on the record before it.  See Local Rule 7-4.01(C).

## BACKGROUND[1]

Plaintiffs are nine individual residents of Illinois who seek work as journeymen roofers and

three corporations who seek to employ the individual defendants and bid on public works projects

in Missouri.  (Defendants' SUMF, ¶ 1).  The remaining Defendants are the Attorney General of

Missouri, the Director of the Missouri Department of Labor ("the Missouri DOL"), and the Chairman

and current Commissioners of the Labor and Industrial Relations Commission ("the Commission").

---

[1] Both parties acknowledge the facts in this matter are largely uncontested.  Defendants did
not file any response to Plaintiffs' Statement of Uncontroverted Material Facts ("Plaintiffs'
SUMF," ECF No. 76-1), and with the exception of Paragraphs 8 through 10, Plaintiffs admitted
all statements in Defendants' Statement of Uncontroverted Material Facts ("Defendants' SUMF,"
ECF No. 74).  As such, all facts contained in the Court's Background section are admitted by all
parties.  See Local Rule 7-4.01(E).

(Id., ¶¶ 2-4). Plaintiffs challenge the constitutionality of Missouri's Excessive Unemployment Law ("Excessive Unemployment Law" or "Law"), MO. REV. STAT. §§ 290.550-290.580, and seek declaratory, injunctive, and 42 U.S.C. § 1983 relief. (Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment ("Defendants' Memo in Support"), ECF No. 73, p. 1). For purposes of summary judgment, Defendants concede Plaintiffs have standing to question the constitutionality of the Excessive Unemployment Law. (Id., p. 2).

## I. Missouri's Excessive Unemployment Law

Missouri's Excessive Unemployment Law provides that, during times when Missouri's unemployment rate has exceeded 5% for the preceding two months, only Missouri laborers or laborers from "nonrestrictive states" may be employed in the construction of public works projects. (Plaintiffs' SUMF, ¶ 76). Nonrestrictive states are states that have not enacted laws that restrict Missouri laborers from working on public works projects in those states. (Id.). The Commission is the public body authorized to determine which states are restrictive and which are nonrestrictive. (Id.). The following twenty-nine states are currently classified by the Commission as nonrestrictive states: Alabama, Arkansas, Georgia, Hawaii, Indiana, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Nebraska, New Hampshire, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, and Wisconsin. (Id., ¶ 18).

The Commission does not determine whether another state's restrictive laws are effective but rather whether the intent of another state's laws was to restrict Missouri workers from working on a public works job in that state. (Id., ¶ 50). Similarly, the Commission does not evaluate whether another state's restrictive laws are enforced by that state. (Id., ¶¶ 59, 60). Both Plaintiffs and

Defendants acknowledge there is no legislative history for the Excessive Unemployment Law. (Id., ¶ 75).

The Missouri DOL has determined that, for purposes of the Excessive Unemployment Law, Missouri has been in a period of excessive unemployment since October 2007. (Id., ¶ 26). The Missouri DOL defines "laborer" as any person who performs actual construction work on a public works project. (Id., ¶ 40). Persons on the site of a public works project who are engaged only in instructional or supervisory activities are not considered laborers. (Id.).

Laborers from restrictive states may be employed in the construction of public works projects when Missouri laborers or laborers from nonrestrictive states are unavailable or are incapable of performing the particular type of work involved, if so certified by the contractor and approved by the contracting officer. MO. REV. STAT. § 290.560. To satisfy this certification process, a contractor must contact contractor and labor groups and organizations to verify that there are no workers available or capable of performing the work required. (Plaintiffs' SUMF, ¶ 42). The contractor must do a thorough search of the entire state of Missouri and then check with all nonrestrictive states. (Id., ¶ 45). The Missouri DOL recommends contacting local unemployment or work force development offices to see if there are any individuals who are currently out of work who are available to perform the work required. (Id., ¶ 42). The Missouri DOL requires a contractor to provide documentation describing the nature and results of their search for Missouri laborers and laborers from nonrestrictive states. (Id.).

Failure to comply with the Excessive Unemployment Law may result in the Missouri DOL seeking injunctive relief against the awarding or continuation of work under any public works contract. (Id., ¶¶ 33, 34). The knowing violation of the Law is considered a crime, and criminal monetary penalties may be assessed for failure to comply with the Law. (Id., ¶¶ 33-35). These civil

remedies and criminal penalties may be used or assessed against the public entity, the contractor, or both parties. (Id., ¶ 35). The Missouri DOL provides a Complaint form on its website by which electronic complaints for failure to comply with the Law may be filed. (Id., 32).

## II. Missouri's Excessive Unemployment Law as Applied to the State of Illinois

On January 10, 2008, the Commission issued a Determination Regarding Public Works Projects During Excessive Unemployment, which held that Illinois had enacted one or more state laws restricting Missouri laborers from working on public works projects in Illinois. (Plaintiffs' SUMF, ¶ 19). Thus, Illinois is currently classified as a "restrictive state." (Id., ¶ 25).

On April 24, 2009, Christopher N. Grant, an attorney for the International Brotherhood of Electrical Workers, Local 702, AFL-CIO, wrote a letter to the Commission. (Id., ¶ 20). In this letter, Mr. Grant pointed out that Illinois's restrictive laws had been ruled unconstitutional in Bernardi v. Leary Construction Co., Inc., 464 N.E.2d 1019 (Ill. 1984) and W.C.M. Window Co., Inc. v. Bernardi, 730 F.2d 486 (7th Cir. 1984) and requested that the Commission reconsider its decision to classify Illinois as a restrictive state. (Id.). On May 4, 2009, the Commission issued an Order acknowledging that the Excessive Unemployment Law had been ruled unconstitutional but refusing to read the Law as only applying to successful statutory efforts to exclude Missouri workers. (Id., ¶ 21).

On November 12, 2009, the Commission issued an Order stating that, by recently adopting Illinois Public Act 96-0037 ("the Illinois Act"), Illinois had adopted six new statutes restricting the ability of Missouri workers to work on a public works project in Illinois. (Id., 22). Therefore, the Commission stated it was reiterating its Determination of January 10, 2008, with regards to the classification of Illinois as a restrictive state. (Id.). In response to another letter from Mr. Grant, the

Commission issued an Order on March 17, 2010, declining to revisit the issue of whether Illinois is a restrictive state. (Id., ¶¶ 24, 25).

### III.     Plaintiffs' Complaint

Plaintiffs filed this action on September 20, 2010. Plaintiffs' Complaint contains three counts. (See Second Amended Complaint ("Complaint"), ECF No. 33, ¶ 56). In Count I, Plaintiffs seek a declaratory judgment that the Excessive Unemployment Law is unconstitutional, void, and unenforceable on the grounds that it violates the Privileges and Immunities Clause of Article IV, section 2, clause 1, of the United States Constitution; the Commerce Clause of Article 1, section 8, clause 3 of the United States Constitution; and the Equal Protection Clause of the Fourteenth Amendment. (Id., ¶¶ 54-61). In Count II, Plaintiffs seek a declaratory judgment that Illinois is a nonrestrictive state under the Law on the grounds that the Illinois Act is unconstitutional. (Id., ¶¶ 62-67). In Count III, Plaintiffs seek an injunction to enjoin the Defendants from enforcing or applying the Law. (Id., ¶¶ 68-71). Under Counts I and III, and pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs seek their attorneys' fees on the grounds that Defendants' violations of the United States Constitution were intentional, reckless, or wanton. (Id., ¶¶ 61, 71).

## STANDARD FOR SUMMARY JUDGMENT

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute."  FED. R. CIV. P. 56(e); Anderson, 477 U.S. at 247.  The nonmoving party may not rest upon mere allegations or denials of its pleadings.  Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor.  Anderson, 477 U.S. at 255.  The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial.  Id. at 249.

When faced with cross-motions for summary judgment, the court is not required to grant judgment as a matter of law for one side or the other.  Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2nd Cir. 1993).  "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  Id.

## DISCUSSION

As an initial matter, the Court notes Plaintiffs' Motion for Summary Judgment and Memorandum in Support raise four provisions of the United States Constitution that are allegedly violated by the Excessive Unemployment Law: the Privileges and Immunities Clause of Article IV, the Commerce Clause of Article I, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  Plaintiffs' Second Amended Complaint, which is Plaintiffs' operative

pleading in this action, does not allege a due process violation. As such, Plaintiffs' motion for summary judgment alleges an additional cause of action that was not raised in Plaintiffs' complaint. Therefore, Plaintiffs' substantive due process claim is not properly before the Court, and the Court declines to address this argument. See Campbell v. Food Service, No. 1:07CV116, 2009 WL 1850906, at *2 (E.D. Mo. June 29, 2009) (refusing to rule on the plaintiff's First and Fourteenth Amendment claims on summary judgment since those claims were not raised in his complaint).

## I.      Privileges and Immunities Clause

Plaintiffs argue the Excessive Unemployment Law violates the Privileges and Immunities Clause of Article IV of the United States Constitution.[2] The Privileges and Immunities Clause provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. CONST. art. IV, § 2. The primary purpose of the Privileges and Immunities Clause was to help fuse into one Nation a collection of independent, sovereign States. Toomer v. Witsell, 334 U.S. 385, 395 (1948). The Clause was designed to perform the following:

> to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned. It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; it gives them the right of free ingress into other States, and egress from them; it insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; and it secures to them in other States the equal protection of their laws. It has been justly said that no provision in the Constitution has tended so strongly to constitute the citizens of the United States one people as this.

Hicklin v. Orbeck, 437 U.S. 518, 524 (1978).

---

[2]Since Plaintiffs and Defendants agree that only the individual Plaintiffs have standing to prosecute Plaintiffs' Privileges and Immunities claim, the court will analyze this claim as raised by the individual Plaintiffs alone.

As an initial matter, the court must decide whether the ordinance burdens one of those privileges and immunities protected by the Clause. United Bldg. and Const. Trades Council of Camden County and Vicinity v. City of Camden, 465 U.S. 208, 218 (1984). Not all forms of discrimination against citizens of other States are constitutionally suspect. Id. Thus, a court must determine whether an out-of-state resident's interest is sufficiently "fundamental" to the promotion of interstate harmony so as to fall within the purview of the Privileges and Immunities Clause. Id.

The pursuit of a common calling is "one of the most fundamental of those privileges protected by the Clause." Id. at 219. Although public employment is "qualitatively different" from private employment, the United States Supreme Court has recognized that employment on public works projects is a fundamental right under the Privileges and Immunities Clause. See id. at 219, 221-22 ("The opportunity to seek employment with such private employers is sufficiently basic to the livelihood of the Nation as to fall within the purview of the Privileges and Immunities Clause even though the contractors and subcontractors are themselves engaged in projects funded in whole or part by the city.") (internal citations omitted). Therefore, the Excessive Unemployment Law burdens a privilege protected by the Privileges and Immunities Clause.[3]

If a challenged restriction deprives nonresidents of a privilege or immunity protected by the Privileges and Immunities Clause, a court will hold it invalid unless (1) there is a substantial reason for the difference in treatment, and (2) the discrimination practiced against nonresidents bears a close relationship to the state's objective. Toomer, 334 U.S. at 396. Thus,

> [t]he inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. As part of any justification offered for the discriminatory law, nonresidents must somehow be shown to constitute a peculiar source of the evil at which the statute is aimed.

---

[3] Both Plaintiffs and Defendants also acknowledge the Excessive Unemployment Law affects a privilege protected by the Privileges and Immunities Clause.

Camden, 465 U.S. at 222 (internal citations omitted).

In Hicklin, 437 U.S. at 533-34, the Supreme Court used the Privileges and Immunities Clause to strike down legislation in Alaska that required that all state oil and gas leases and permits contain a provision requiring the employment of Alaska residents in preference to nonresidents. The Hicklin Court noted that the legislation was passed "professedly for the purpose of reducing unemployment in the State." Id. at 520. The Court found the position of the challengers to the law was "strongly supported by this Court's decisions holding violative of the Clause state discrimination against nonresidents seeking to ply their trade, practice their occupation, or pursue a common calling within the State." Id. at 524.

The Court found that even assuming a state could enact legislation discriminating against nonresidents as a way to combat in-state unemployment--an assumption the Court found "at least dubious"--there was no showing that nonresidents were "a peculiar source of the evil" (i.e., a cause of high unemployment) that the legislation in Hicklin was enacted to remedy. Id. at 526. Instead, the Court found the record contained evidence that the major cause of Alaska's high unemployment was the lack of education and job training and the geographical remoteness from job opportunities of a substantial number of Alaska's unemployed residents. Id. at 526-27. Furthermore, the Court found that even if nonresidents could be considered "a peculiar source of evil," the legislation in Hicklin did not bear a substantial relationship to the "evil" the nonresidents presented because the legislation simply granted all Alaskans a flat employment preference regardless of their employment status, education, or training. Id. at 527. The legislation's "across-the-board grant of a job preference to all Alaskan residents" was, therefore, not closely tailored to aid the unemployed. Id. at 528.

The Supreme Court later confirmed that the reasoning delineated in <u>Hicklin</u> applied to cases involving laws giving employment preference on public works projects to state residents. <u>See</u> <u>Camden</u>, 465 U.S. at 221 ("Much of the same analysis [in <u>Hicklin</u>], we think, is appropriate to a city's efforts to bias private employment decisions in favor of its residents on construction projects funded with public monies.").

Courts applying <u>Hicklin</u> to determine the validity of laws requiring or giving preference to the employment of residents by contractors engaged in the construction of public works projects have nearly uniformly ruled that such laws violate the Privileges and Immunities Clause. <u>See, e.g.</u>, <u>A.L. Blades & Sons, Inc. v. Yerusalim</u>, 121 F.3d 865, 876 (3rd Cir. 1997) (statute requiring that contractors on public works projects hire only Pennsylvania laborers and mechanics violated the Privileges and Immunities Clause); <u>W.C.M. Window Co., Inc. v. Bernardi</u>, 730 F.2d 486, 497-98 (7th Cir. 1984) (statute requiring the employment of only Illinois laborers on public works projects, unless Illinois laborers were unavailable or unqualified, violated the Privileges and Immunities Clause); <u>Massachusetts Council of Constr. Employers, Inc. v. Mayor of Boston</u>, 425 N.E.2d 346, 352-53 (Mass. 1981) (statute mandating that private contractors on state-funded construction projects give preference to Massachusetts citizens in hiring for certain positions violated the Privileges and Immunities Clause) (overruled on other grounds); <u>Neshaminy Constructors, Inc. v. Krause</u>, 437 A.2d 733, 737-38 (N.J. 1981) (statute requiring preference in employment on construction contracts awarded by any public body to New Jersey residents who had been in the state for at least one year violated the Privileges and Immunities Clause); <u>Salla v. County of Monroe</u>, 399 N.E.2d 909, 910-11 (N.Y. 1979) (statute requiring preference in employment on construction contracts awarded by any public body to New York residents who had been in the state for at least one year violated the Privileges and Immunities Clause); <u>Laborers Local Union v. Felton Constr. Co.</u>, 654 P.2d 67, 72

(Wash. 1982) (statute requiring that contractors on public works projects have Washington residents as 90 to 95 percent of their employees violated the Privileges and Immunities Clause); see also Construction & General Laborers Union v. St. Paul, 134 N.W.2d 26 (Minn. 1965); Opinion of the Justices to the Senate, 469 N.E.2d 821 (Mass. 1984).

Here, unlike the cases noted above, the Excessive Unemployment Law does not indicate an employment preference for Missouri residents on public works projects but rather an equal preference for Missouri residents and residents of nonrestrictive states at the expense of residents of restrictive states. In those cases, the contested preference laws were ostensibly designed to address in-state unemployment. In this case, Defendants describe the goal of the Law as follows: "to prevent bordering states from preventing Missouri construction workers from crossing into the neighboring state while sending workers from that state to Missouri." (Defendants' Memo in Support, p. 9). Thus, "[t]he 'evil' targeted is the legislative enactment by state legislators elsewhere" (Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Memo in Support"), ECF No. 76, p. 16), coupled with the employment, in Missouri, of laborers who are residents of states where legislators have enacted laws discriminating against Missouri residents.

Defendants have failed to articulate a substantial reason for treating residents of restrictive states differently than Missouri residents or residents of nonrestrictive states under the first prong of the Privileges and Immunities Clause analysis. Looking at the Law in the light most favorable to Defendants, the reason for the difference in treatment is to influence legislators in restrictive states by directly discriminating against residents of restrictive states. The Excessive Unemployment Law's attempt to influence the behavior of other state legislatures is not a substantial reason to deprive nonresidents of the fundamental privilege of pursuing employment. While the Law may have a

secondary goal or even the effect of encouraging the employment of Missouri workers, this goal or effect is not the Law's primary purpose.

The failure of Defendants to identify a substantial reason for the Excessive Unemployment Law ends the Court's Privileges and Immunities Clause inquiry. Without a substantial reason for the difference in treatment, the Court need not evaluate whether the Law's discrimination bears a close relationship to its objective. See Felton, 654 P.2d at 71 ("Absent an identified 'peculiar evil,' it is difficult to determine if the statute is closely related to eliminating the alleged evil nonresidents present. Needless to say, if the evil is not identified, legislation can hardly be closely related to eliminating it.").

Furthermore, given that the Supreme Court has rejected the argument that employed nonresidents are automatically a source of high residential unemployment so as to enable protectionist legislation to pass scrutiny under the Privileges and Immunities Clause, the Court finds it difficult to issue guidance to Defendants to enable the reformation of the Excessive Unemployment Law. The Supreme Court's Privileges and Immunities Clause jurisprudence, and the application of this jurisprudence by lower courts, suggest few laws preferring in-state workers will pass constitutional analysis. Absent the state providing a record clearly showing nonresident laborers from restrictive states constitute a particular threat to the employment of Missouri laborers, a protectionist and retaliatory law such as the one in question here will likely fall to a challenge under the Privileges and Immunities Clause.

## II.     Commerce Clause

### A.     Commerce Clause Generally

Plaintiffs argue the Excessive Unemployment Law violates the Commerce Clause of Article I of the United States Constitution. The Commerce Clause grants Congress the power to regulate

commerce among the states.  U.S. CONST. art. I, § 18.  It primarily has been applied to state taxes and regulatory measures that restrict free trade by imposing burdens on out-of-state economic interests.  Red River Service Corp. v. City of Minot, 146 F.3d 583, 586 (8th Cir. 1998) (citing Reeves, Inc. v. Stake, 447 U.S. 429, 440 (1980)).  This limitation on state power, frequently called the "dormant" Commerce Clause, "prohibits economic protectionism--that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."  Id. (quoting New Energy Co. v. Limbach, 486 U.S. 269, 273 (1988)).

When a state or local government acts as a market participant rather than a market regulator, however, its conduct is outside the reach of the Commerce Clause.  Id.  If a state or local government is a market participant in a business, it may pursue its own economic interests free from the constraints imposed by the Commerce Clause within the market in which it is a participant.  Id. (citing South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 97 (1984)).  This freedom includes the right to choose its own trading partners without regard to whether its choices discriminate against out-of-state businesses or favor its own citizens.  Id. (citations omitted).  Thus, if the state activity constitutes only market participation, then the Commerce Clause does not apply and our inquiry ends.  National Solid Waste Mgmt. Ass'n v. Williams, 146 F.3d 595, 599 (8th Cir. 1998) (citing Reeves, 447 U.S. at 436-39).

### B.    Local Government Action is State Action

Plaintiffs argue local governments are separate and distinct from the State of Missouri for purposes of market participant analysis under the Commerce Clause.  See W.C.M. Window Co., Inc. v. Bernardi, 730 F.2d 486, 496 (7th Cir. 1984) ("When the project on which the state impresses a home-state preference is undertaken by a unit of local government without any state financial support or supervision, the state is not a participant in the project but a regulator.").  Since the Excessive

Unemployment Law applies to local government projects, Plaintiffs assert the state is automatically acting as a market regulator by enforcing it.

Plaintiffs acknowledge the Eighth Circuit rejected this contention in <u>Nat'l Solid Waste Mgmt. Ass'n. v. Williams,</u> 146 F.3d 595, 599 (8th Cir. 1998), finding that local government units were not independent of the state. Plaintiffs argue the Court should ignore the Eighth Circuit's analysis in <u>Williams</u>, which weighed both sides of the argument before rejecting the position of the Seventh Circuit in favor of the position of the Third, Fourth, and Ninth Circuits. <u>See</u> <u>Trojan Tech., Inc. v. Commonwealth of Pennsylvania</u>, 916 F.2d 903, 911 (3d Cir. 1990) ("We find no compelling analytical difference between a local government unit and central state agencies."); <u>Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel</u>, 20 F.3d 1311, 1319-20 (4th Cir. 1994) ("We agree with the Third and Ninth Circuits that the distinction <u>Bernardi</u> draws between state and local governments simply does not make sense in this constitutional matter."); <u>Big Country Foods, Inc. v. Board of Educ.</u>, 952 F.2d 1173, 1179 (9th Cir. 1992) ("Political subdivisions generally exist at the will of the state. A state should not be penalized for exercising its power through smaller localized units....") (citations omitted).

Furthermore, the Supreme Court has dismissed the argument that there is a distinction between municipal action and state action under the Privileges and Immunities Clause as well as the Equal Protection Clause. <u>See</u> <u>Camden</u>, 465 U.S. at 215 ("It is as true of the Privileges and Immunities Clause as of the Equal Protection Clause that what would be unconstitutional if done directly by the State can no more readily be accomplished by a city deriving its authority from the State.").

The Court finds the Eighth Circuit has already determined that local government action constitutes state action for purposes of Commerce Clause analysis. Therefore, applying the market participant exception to the Excessive Unemployment Law is appropriate.

### C. The State is Acting as a Market Participant

As noted above, when a state or local government acts as a market participant rather than a market regulator, its conduct is outside the reach of the Commerce Clause. The Supreme Court has addressed the application of the market participant exception to regulations governing employment on public works projects. In <u>White v. Massachusetts Council of Const. Employers, Inc.</u>, 460 U.S. 204, 205-96 (1983), the Supreme Court examined an executive order issued by the mayor of Boston that required the performance of all construction projects "funded in whole or in part by city funds, or funds which the city had the authority to administer," by a work force consisting of at least half *bona fide* residents of Boston. The Court in <u>White</u> held that the application of the mayor's executive order did not violate the Commerce Clause of the United States Constitution. <u>Id.</u> at 214. While the challengers to the mayor's order argued that "much of the construction subject to the mayor's order involved nonpublic projects that were financed largely through private funds," the Court found this assertion unsupported by the record before it. <u>Id.</u> at 208-09. The Court found that, therefore, "the only issues before [it]" were the propriety of applying the mayor's order to projects funded wholly with city funds and projects funded in part with federal funds. <u>Id.</u> at 209. Thus, "[i]nsofar as the city expended only its own funds in entering into construction contracts for public projects, it was a market participant." <u>Id.</u> at 214. According to the Court, "in this kind of case there is 'a single inquiry: whether the challenged program constituted direct state participation in the market.'" <u>Id.</u> at 208 (citing <u>Reeves</u>, 447 U.S. at 436 n.7).

The Eighth Circuit has taken a broader view of the White Court's interpretation of the market participant exception than the one advanced by Plaintiffs. While the Court in White noted in a footnote that those affected by the mayor's order were all "working for the city" in an "informal sense," the Eighth Circuit refused to find the Supreme Court's application of the market participant exception was limited to situations where the city is the employer of those affected by the regulation at issue:

> The plaintiffs argue that the state is not acting as a market participant because it is not acting as a buyer, seller, or employer. The plaintiffs base this argument on the roles the states played in the three Supreme Court cases applying market participant exception. See White, 460 U.S. at 205–06 (employer); Reeves, 447 U.S. at 432 (seller); and [Hughes v.] Alexandria Scrap [Corp.], 426 U.S. [794,] 799 [(1976)] (buyer). The reasoning of these cases, however, does not support the plaintiffs' argument. **The Court's inquiry in the market participation cases asks not whether the state is acting as a buyer, seller, or employer when it participates in a market, but whether the state is actually participating in a narrowly defined market as a proprietor rather than simply regulating the actions of other private market participants.**

Chance Management, Inc. v. South Dakota, 97 F.3d 1107, 1111 (8th Cir. 1996) (emphasis added) (internal citations omitted). Thus, according to the Eighth Circuit, the relevant inquiry in a dormant Commerce Clause case that potentially implicates the market participant exception is whether the state is participating as a proprietor; the state does not need to be an employer, buyer, or seller to be considered a market participant.

Recent Eighth Circuit cases evaluating whether a state is acting as a market participant have uniformly found that the state is operating as a market participant. See Williams, 146 F.3d at 600 (holding Minnesota acts as a market participant by contracting for waste disposal services, and finding county's plan dictating the disposal of solid waste did not violate the Commerce Clause); Red River, 146 F.3d at 588 (holding North Dakota acts as a market participant by operating a landfill, and finding the decision to limit access to the landfill to residents and grandfathered entities did not violate

the Commerce Clause); <u>Chance</u>, 97 F.3d at 1114 (holding South Dakota acts as a market participant by operating the South Dakota Lottery, and finding the decision to require that a majority interest of any corporate video lottery machine operator is held by South Dakota residents is not subject to Commerce Clause restrictions); <u>Independent Charities of America, Inc. v. Minnesota</u>, 82 F.3d 791, 800 (8th Cir. 1996) (holding Minnesota acts as a market participant by enabling state employees to deduct charitable contributions from their paychecks, and finding the requirement that 90 percent of the board of directors of participating charities must live or work in the community exempt from scrutiny under the Commerce Clause); <u>see also</u> <u>Four T's, Inc. v. Little Rock Mun. Airport Comm'n.</u>, 108 F.3d 909, 913 (8th Cir. 1997).

Here, as mandated by the Supreme Court's decision in <u>White</u>, the dormant Commerce Clause begins with a single inquiry: whether the Excessive Unemployment Law constitutes direct state participation in the market. If the Law constitutes direct state participation, the market participant exception applies, and the Law is not subject to the requirements of the Commerce Clause. The Eighth Circuit noted that the relevant question is not whether the state is behaving as an employer, seller, or buyer, but whether the state is participating as a proprietor in a narrowly defined market.

With the exception of a tax increment financing ("TIF") shopping center project (<u>see</u> Plaintiffs' SUMF ¶ 54), all construction projects mentioned in Plaintiffs' Motion for Summary Judgment and Plaintiffs' related filings involved structures owned by public school districts, public universities, or other public entities. In each of these transactions, a public entity acted as the owner of the public works project and, therefore, as a market participant and not as a market regulator.

Plaintiffs cite <u>Tri-M Group, LLC v. Sharp</u>, 638 F.3d 406 (3rd Cir. 2011) in support of their assertion that the Excessive Unemployment Law is too far-reaching to constitute mere market participation. In <u>Sharp</u>, the Third Circuit held that Delaware's regulatory scheme for the training and

compensation of apprentices on construction projects constituted market regulation and violated the dormant Commerce Clause. Id. at 426, 429. The Delaware Prevailing Wage Law ("Prevailing Wage Law") provided that, for certain projects funded at least partially by the state, mechanics and laborers (included apprentices) would be paid a prevailing wage set by the Delaware Department of Labor. Id. at 412. The regulations established that employers must pay apprentices a fraction of the wages earned by mechanics, with the contractors who registered their apprenticeship programs in Delaware eligible to pay their apprentices a lower wage than out-of-state contractors. Id. at 412-13. To register an apprenticeship program in Delaware, a contractor must be a "Delaware Resident Contractor" or hold and maintain a "Delaware Resident Business License," which means the contractor must have a permanent place of business in Delaware. Id. Thus, an out-of-state contractor cannot sponsor an apprenticeship program without setting up and maintaining a permanent office location in Delaware. Id.

In Sharp, the state argued the prevailing wage conditions were "analogous to a private party's attaching labor conditions to private market transactions," which the court indicated would permit the application of the market participant doctrine if it was "an accurate characterization of the state's conduct." Id. at 422. However, the court found the prevailing wage conditions were "part of an expansive regulatory scheme that controls the market activities of private participants...[and] clearly reflects a governmental interest in setting labor policy...." Id. The court noted that "once a contractor becomes a Delaware-registered apprenticeship program sponsor, it must adhere to the apprentice prevailing wage rates and training requirements regardless of whether the contractor is thereafter performing labor on a public or private contract." Id. at 423. Thus, the prevailing wage conditions were not limited to public works projects and could potentially extend to private projects outside of Delaware. Id.

The regulatory scheme in <u>Sharp</u> is distinguishable from the Excessive Unemployment Law at issue here. The regulations in <u>Sharp</u> may have encouraged contractors to register their apprenticeship programs in Delaware, but all contractors who became Delaware-registered apprenticeship program sponsors then became bound by the apprenticeship regulations regardless of whether the contractor performed on a public contract or on a private contract devoid of Delaware's direct involvement. Furthermore, Delaware was forcing out-of-state businesses to set up offices in Delaware if the businesses wanted to take advantage of more favorable apprenticeship regulations. The regulatory scheme in <u>Sharp</u> extended beyond the immediate contract for services between the state and the contractor, suggesting the regulations were intended to further labor policy instead of placing restrictions on the state's purchase of goods and services.

Additionally, Plaintiffs argue the Excessive Unemployment Law constitutes marketplace regulation of private parties by extending to public projects financed by TIF. Missouri authorizes municipalities to use TIF in MO. STAT. ANN. §§ 99.800 to 99.865 (the "TIF Act"). The TIF Act operates in three steps: (1) a municipal finding of "blight" or other economic underutilization, (2) the identification of increased property taxes and other local taxes, such as sales taxes, that would result from redevelopment of that area, and (3) the funneling of such "increment" to finance the construction of the redevelopment project generating the tax increase. <u>See</u> MO. STAT. ANN. §§ 99.805, 99.810.

A "redevelopment plan" must be created by the municipality to show how the payment of redevelopment costs would reduce or eliminate the conditions that qualified the redevelopment area as "blighted" and to show how the proposed redevelopment would enhance the tax bases of the local taxing districts. MO. STAT. ANN. § 99.805(13); <u>see</u> <u>id.</u> § 99.810. Once the redevelopment plan is proposed, the municipality creates a "TIF Commission" to hold a public hearing on the plan and to

vote on or make recommendations to the municipality relating to the plan. MO. STAT. ANN. § 99.820. Thereafter, if the commission approves the redevelopment plan, the municipality adopts an ordinance approving the plan. MO. STAT. ANN. § 99.825(1). If the commission opposes the plan, the municipality may still approve the plan with a two-thirds majority vote. Id. § 99.825(2).

The TIF Act empowers a municipality to acquire real property "reasonably necessary to achieve the objectives of the redevelopment plan and project" by eminent domain and to convey the real property obtained through the condemnation process to private ownership in order to effectuate the redevelopment plan. Tax Increment Financing Comm'n of Kansas City v. J.E. Dunn Const. Co., Inc., 781 S.W.2d 70, 73 (Mo. banc 1989) (citing MO. STAT. ANN. § 99.820(3)). By applying the real estate tax rate and other applicable taxes of all taxing districts having taxing power within a redevelopment area to the increased valuation of the real estate within the area as a result of the redevelopment, a tax "increment" is produced and paid by the owner of the real property as a "payment in lieu of taxes" ("PILOTS"). See J.E. Dunn, 781 S.W.2d at 73. The PILOTS are deposited into a special allocation fund used to retire principal and interest on the bonds issued by the municipality to finance the redevelopment project. See MO. STAT. ANN. § 99.835. After all redevelopment project costs are paid, any surplus funds remaining in the special allocation fund are paid to the taxing districts in the redevelopment area. MO. STAT. ANN. § 99.850(1). The municipality then adopts an ordinance dissolving the special allocation fund for the redevelopment area and terminating the designation of the redevelopment area as a redevelopment area. MO. STAT. ANN. § 99.850(2). Thereafter, each year the governing body of the municipality prepares a report concerning the status of the redevelopment project and submits a copy of the report to the director of the department of economic development. MO. STAT. ANN. § 99.865(1).

The fact that the Excessive Unemployment Law applies to TIF projects does not change the conclusion that the state is acting as a market participant. Based on the level of municipal involvement in TIF projects, it is difficult to see how TIF projects could be considered exclusively private ventures so as to make state requirements for TIF projects automatically regulatory. A TIF project requires the active participation of a municipality at all stages. In order to take advantage of TIF, a municipality must identify an area as "blighted," determine the amount of increased taxes that would result from redevelopment of that area, create a commission to evaluate the redevelopment plan, hold a hearing on the plan, pass an ordinance adopting the plan, issue bonds to cover the redevelopment costs, and make regular reports to the state every year following the completion of the project. Furthermore, a municipality often utilizes its unique power of eminent domain to assemble land for purposes of redevelopment. Even if the municipality is not acting as an employer, buyer, or seller in a TIF project, the municipality is operating as a proprietor. While TIF projects might be considered "traditionally" private, the fact that TIF funds are involved renders them at least quasi-public in nature. Therefore, by applying the Law to TIF projects, Missouri not is acting as a market regulator.

Accordingly, Defendants' Motion for Summary Judgment as to Plaintiffs' Commerce Clause claims in Count I and Count III of Plaintiffs' Complaint is granted. Plaintiffs' Motion for Summary Judgment as to Plaintiffs' Commerce Clause claims in Count I and Count III of Plaintiffs' Complaint is denied.

### III.    Equal Protection Clause

Plaintiffs argue the Excessive Unemployment Law violates the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause of the Fourteenth Amendment states that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST.

amend. XIV, § 1.   As a general rule, legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.  Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).   Accordingly, unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.  Id.  Since Plaintiffs and Defendants acknowledge that the right to seek employment is not a fundamental right and that the Law does not categorize on the basis of an inherently suspect characteristic, the Law is analyzed under  the rational basis test.

Under the rational basis test, a legislative classification must be sustained if the classification itself is rationally related to a legitimate governmental interest.  U.S. Dept. of Agriculture v. Moreno, 413 U.S. 528, 533 (1973).  All that must be shown is any reasonably conceivable state of facts that could provide a rational basis for the classification.  Gilmore v. County of Douglas, 406 F.3d 935, 937 (8th Cir. 2005).  Rational basis review accords challenged statutory classifications a strong presumption of validity which is overcome only if the party challenging them negates "every conceivable basis which might support it."  Indep. Charities of America, Inc. v. Minnesota, 82 F.3d 791, 797 (8th Cir. 1996) (quoting F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993)).

### A.   No Legitimate State Interest

Plaintiffs assert the purpose of the Excessive Unemployment Law is to retaliate against those states that restrict the employment of Missouri construction workers on public works projects.  Defendants claim the purpose of the Law is to protect state workers from discrimination by restrictive states while residents of those restrictive states are employed in Missouri.

Courts have split as to whether a state law giving preference to residents in employment on a public works project violates the Equal Protection Clause.  Some courts have rejected Equal

Protection attacks against state laws expressing a preference for residential workers on public works projects. See, e.g., Camden, 443 A.2d at 161 (city ordinance requiring that 40 percent of the labor force on city public works projects are city residents did not violate the Equal Protection Clause) (reversed on other grounds); Lee v. Lynn, 111 N.E. 700, 701 (Mass. 1916) (statute requiring preference in employment of mechanics and laborers for construction of public works is given first to Massachusetts citizens and second to United States citizens did not violate the Fourteenth Amendment); Lillard v. Melton, 87 S.E. 421, 423-24 (S.C. 1915) (statute providing that all laborers employed in the improvement of highways are actual residents of the county did not violate the Fourteenth Amendment) (overruled on other grounds).

Other courts have struck down state laws preferring residential workers on public works projects on Equal Protection grounds where the laws required residency for a certain period of time. See, e.g., People ex rel. Holland v Bleigh Constr. Co., 335 N.E.2d 469, 477 (Ill. 1975) (statute requiring public works projects employ only Illinois laborers who had resided in Illinois for at least a year violated the Equal Protection Clause); Construction & General Laborers Union v St. Paul, 134 N.W.2d 26, 31-32 (Minn. 1965) (ordinance compelling all contractors who performed work for the city to employ only residents of a particular county who have resided in that county for at least six months violated the Equal Protection Clause); but see Gould v. Bennett, 153 Misc. 818, 820-21 (N.Y. 1934) (statute providing a preference for citizens New York who had been residents for at least six consecutive months immediately prior to the commencement of their employment did not violate the Fourteenth Amendment).

These decisions suggest that while showing a preference for hiring state or county residents for public works projects is permissible under the Equal Protection Clause, any additional requirements may not withstand Equal Protection scrutiny. Under these decisions, preferring to

employ residents of the state or county where the project is located is a legitimate governmental interest, but attempts to sub-categorize residents of the state or county any further violate the Equal Protection Clause.

The Excessive Unemployment Law goes beyond expressing a preference for Missouri construction workers on public works projects or requiring that Missouri residents constitute a certain number of construction workers on public works projects. A public works project could conceivably employ all non-Missouri residents from nonrestrictive states, even without initially looking to employ Missouri residents, without running afoul of the Law. The record shows the intent of the Law is to punish workers from states that restrict the employment of Missouri workers. Thus, the Law's objective is not to favor workers from Missouri.

Exacting retribution against states who limit the employability of Missouri construction workers by limiting the employment of those states' workers is not a legitimate governmental interest. A law that disadvantages a politically unpopular group for no reason other than the inherent unpopularity of the group lacks a legitimate state interest under the Equal Protection Clause. See Moreno, 413 U.S. at 534 ("For if the constitutional conception of 'equal protection under the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.").

In Planned Parenthood of Minnesota v. Minnesota, 612 F.2d 359, 360 (8th Cir. 1980), the Eighth Circuit held a state statute providing funds for pre-pregnancy family planning to hospitals and health maintenance organizations but not to nonprofit organizations such as Planned Parenthood was unconstitutional under the Equal Protection Clause. The court found that the distinction contained in the statute did not further a legitimate governmental purpose:

> The record demonstrates that Planned Parenthood of Minnesota in its abortion stance has made itself unpopular among some segments of the population. The legislative

history of [the statute] indicates that Planned Parenthood's unpopularity played a large role in its passage. Planned Parenthood's unpopularity in and of itself and without reference to some independent considerations in the public interest cannot justify [the exclusion of funding].

Id. at 361.

The Excessive Unemployment Law does not serve a legitimate governmental purpose. The Law is designed to disadvantage workers who are residents of states with laws that discriminate against Missouri workers, and Defendants have not shown any other public interest considerations to justify the Law's difference in treatment. Thus, the Law is purely punitive in nature. While the Law might result in the increased employment of Missouri residents or cause a neighboring state to rethink implementing or continuing a discriminatory public works employment policy, these results are incidental to the Law's main purpose.

### B.     No Rational Relationship

Even assuming the purpose of the Excessive Unemployment Law is to bolster the employment prospects of Missouri residents, which some courts have considered a legitimate government purpose, the Law bears no rational relationship to this purpose. As indicated above, the Law serves only to ensure that residents of restrictive states are permitted to perform construction work on public works projects if qualified workers cannot be found in Missouri or in any nonrestrictive state. As such, the Law gives equal employment preference to Missouri residents and residents of nonrestrictive states. Missouri residents are not preferred above the residents of all other states but are simply preferred above the residents of restrictive states. Thus, assuming the Law leads to the increased employment of Missouri residents, such a result is only a corollary to the decreased employment of residents of restrictive states. Therefore, the Excessive Unemployment Law violates the Equal Protection Clause of the United States Constitution.

### IV.     Declaratory Relief as to the Illinois Act

Finally, Plaintiffs request a declaratory judgment asserting that, since the Illinois Act is unconstitutional, Illinois is not a restrictive state under the Excessive Unemployment Law. Given that the Court has already determined the Law is unconstitutional under the Privileges and Immunities and Equal Protection Clauses of the United States Constitution, the Court need not address Plaintiffs' argument.

## <u>CONCLUSION</u>

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment (ECF No. 70) is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 72) is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing.


Dated this  5th  day of March, 2012.


/s/Jean C. Hamilton
UNITED STATES DISTRICT JUDGE